9254

KLUGH ET AL. v. SEMINOLE SECURITIES CO. ET AL.

(87 S. E. 644.)

TRUSTS AND TRUSTEES. MODIFICATION OF TRUST. LIABILITIES OF TRUSTEES.

1. TRUSTS—TRUSTEES—DUTIES.—The duties of trustees are to carry out the trust, to use due care therein, and to act in good faith.

2. TRUSTS—TRUSTEES—DUTIES—DEGREE OF CARE.—While a trustee must exercise in the performance of his trust due care, independently of the question of good faith, it is not required that he exercise extraordinary care, but only the care required of a man of common prudence in his own business.

3. TRUSTS—TRUSTEES—DUTIES—ACTIONS—QUESTION FOR JURY.—Whether a trustee exercised common prudence in any particular case is a question of fact.

4. TRUSTS—TRUSTEES—DUTIES.—The only duty of trustees on whom the power of purchasing an insurance corporation was conferred, was that of being reasonably certain that the thing for which they paid the trust fund was valuable, and that duty was fulfilled when they received advice of reputable men that the thing purchased was worth more than the price paid for it.

5. TRUSTS AND TRUSTEES—LIABILITIES—NEGLIGENCE.—Volunteers acting gratuitously as trustees for a corporation, under contract with it, to hold the proceeds of sale of its stock until the fund should amount to a specified sum, and then to invest same in stock of a proposed accident insurance company, which should be held and voted by them in the interest of the cestui que trustent corporation are required to use only common prudence and care in performing the trust, and to be reasonably certain in disbursing the funds, at the direction of the corporation, that the thing for which they were paying out the fund was valuable.

6. TRUSTS—TRUSTEES—DUTIES—LIABILITIES.—Where duties are conferred by an express trust, the terms of the trust must be conformed to by the trustees, and for failure to do so they are liable for any loss to the cestui que trust.

7. TRUSTS — AGREEMENT — MODIFICATION.—A trust agreement may be modified by consent of all the parties in interest, as may any other contract.

8. TRUSTS—AGREEMENT—MODIFICATION BY CESTUI.—Where the stockholders of one corporation paid into it certain sums of money and directed the appointment of trustees to expend the money in the purchase of an insurance company, the money became in fact a trust fund, whose beneficiary was the corporation, so that it might, without consent of the stockholders, direct a modification of the trust agreement.

9. TRUSTS—AGREEMENT—CONSTRUCTION.—Where the stockholders of a corporation paid into its treasury certain moneys to be used in organizing an insurance company which should be called by a specified name, it was not of the essence of the trust agreement that the company organize the insurance concern or that ·it be called by a given name, but the trustees were authorized to purchase another insurance company and retain the old name.

10. TRUSTS—AGREEMENT—CONSTRUCTION.—In such case, where ·the agreement also specified that the *cestui* should own the entire issue of stock of the company to be organized, that provision was subject to change by the *cestui.*

11. TRUSTS—TRUSTEES—LIABILITY.—Where a trust agreement provided that a certain amount of money paid in by the stockholders of a corporation should be expended in the purchase of an insurance company, and after deliberation and securing advice the trustees purchased an insurance organization, which was later found to be worth less than the price paid, the trustees could not be held to have violated the trust.

12. TRUSTS — MODIFICATION. — Where a trust was created by contract between a corporation, as the beneficiary, and individuals, as trustees, it was within the power of the beneficiary corporation to modify the trust agreement; and where ·it was impossible for the beneficiary corporation to carry out the provisions of the trust agreement to the letter, the trustees should not be held responsible for any loss which may have resulted from their disbursing the trust fund in good faith, with due care, and in accord with the directions of the officers and directors of the beneficiary corporation, after notice to its stockholders and without objection by them.

Before MEMMINGER, J., Columbia, December, 1913. Affirmed.

Action brought by J. S. Klugh and others on behalf of themselves and others as stockholders of the Seminole Securities Company against that company, its directors and trustees, seeking a receivership for the company, and an accounting by W. A. Clark, T. S. Bryan and Wilie Jones, trustees.

The following facts appear in the agreed statement of case:

The Seminole Securities Company was chartered under the laws of the State of South Carolina on or about the

9th day of January, 1908, being authorized by its charter to act as agent and manager for financial corporations and insurance companies of all kinds; to buy, sell and own stocks and bonds and other securities of other corporations, both domestic and foreign.  The authorized capital stock was three hundred thousand (300,000) shares of the par value of one dollar per share.  John Y. Garlington was president and director; J. S. Young, secretary and treasurer, and J. H. Teague, G. D. Young and M. G. Jeanes were directors.

On the 31st day of January, 1908, a certain trust agreement was entered into between the Seminole Securities Company, of the first part, and W. A. Clark, Wilie Jones and T. S. Bryan, of the other part.  This trust agreement is set out in the dissenting opinion of Mr. Justice Fraser.  A circular letter signed by the defendant, "W. A. Clark, as trustee," setting forth in detail the terms of the trust assumed by the defendant trustees under their trust agreement, was issued and placed in the hands of agents soliciting subscriptions to the capital stock of Seminole Securities Company.

Approximately 270,672 shares of stock in the Seminole Securities Company, of the par value of one dollar per share, were sold at a premium of fifty per cent., and the testimony tends to show that this premium of fifty per cent. was paid as commissions to the agents selling said stock.  The testimony of Mr. W. A. Clark was that he had no knowledge of the action or representations of the officers of the Seminole Securities Company, or its agents, in obtaining subscriptions, and signed only the circular letter alluded to, nor in any way authorized the use of his name other than what appears in said circular, and whenever spoken to by any one concerning it explicitly referred to the trust agreement as containing his entire connection with the Seminole Securities Company, nor did he take any part or have anything to do with the obtaining of subscriptions to the capital

stock of the Seminole Securities Company, or receive any money from any subscriber.

Between the 11th day of March and the 18th day of June, 1908, of the proceeds of sale of stock approximately one hundred thousand ($100,000) dollars was, by Garlington, as president of the company, placed in the hands of the defendant trustees, Clark, Jones and Bryan, in cash; part in certificates of deposit issued by various banks and part in notes of various parties, all of which were subsequently paid over and delivered in accordance with the resolutions of Seminole Securities Company in the agreement between it and the Southern Life Insurance Company to the Southern Life Insurance Company.

Pursuant to the terms of the trust agreement the trustees began preparations for the organization of the Sterling Accident Company.

That some time about the first of the month of September, 1908, and while these preparations were in progress negotiations were entered into between the Southern Life Insurance Company, of Fayetteville, N. C., and the Seminole Securities Company, the former proposing to sell to the latter 3,000 shares of stock of said Southern Life Insurance Company of the par value of $50.00 per share. Said negotiations, however, were unknown to the trustees and are evidenced by the resolutions of the two companies made exhibits to the answers of the said trustees (which said exhibits were before the Court). Certain resolutions and correspondence between the two companies were had and passed, and certified to the trustees, which resolutions embodied the agreements between the two companies, all of which was the only knowledge the trustees had of this transaction until upon the receipt of said resolutions the trustees began to examine into the propriety of said sale and as to their duty in regard thereto. This investigation resulted, as the agreed statement shows, in disclosing that the Southern Life Insurance Company was a live and going

concern and doing a prosperous business; that the president and directors thereof were men of high reputation and financial standing in the State of North Carolina; that all of the stock proposed to be sold, excepting a mere fraction thereof, was to be treasury stock, this fraction, however, was represented to belong to the company, but was hypothecated for a loan; that the said Southern Life Insurance Company was licensed to do business in the State of South Carolina and other Southern States and had a life insurance business of $5,000,000.00 on its books at the time; that it had the power under its charter to do a fidelity and casualty business. There was some difference of opinion as to the reasonableness of the price to be paid for the stock; the report of the actuary of the Southern Life Insurance Company showed that the book value of the stock at the time said report was written was $225.57 for every $100.00 of stock, and that "the commercial or insurance value" was $303.00 for each $100.00 of stock, in which Mr. Hall, an experienced insurance man, of Atlanta, and Mr. Rodgers, an insurance man of North Carolina, concurred, while the opinion of another actuary to whom said report was submitted was that, based upon the statements included in said report, the book value of the stock would not exceed $117.64 for each $100.00 of stock, and the reasonable price to be paid for the control would be $150.00 for each $100.00 of stock. It was, however, submitted to the board of directors of Seminole Securities Company and represented to the trustees, that even accepting this opinion as being more correct, the price at which the stock was offered would be reasonable, in view of the fact that it was treasury stock, and inasmuch as the Seminole Securities Company would thus save all expense incident to the organization of a new company, and the further expense necessary to making the company a going concern and meeting its operating expenses until it could become self-sustaining. An examination further disclosed that it would be, in the situation that

·presented itself, extremely risky to commence an accident company out and out on a capital of $100,000, on account of the expense incident to organizing the same and organizing its agency force and other expenses necessary to make the company a going concern. Other insurance men testified that it would be hazardous to organize a casualty and fidelity company on a capital stock of $100,000, as this capital stock would probably be largely impaired on account of the expense of organization, the organization of its agency and force and other expenses necessary to make the company a going and self-sustaining concern, and in view of these facts it would, as a general proposition, be more economical to purchase a concern already established and engaged·in business than to organize a new company. The defendant trustees having made their investigation of the proposed sale of stock of the Southern Life Insurance Company, and having considered the formal resolutions of the board of directors of the Seminole Securities Company, acquiesced therein and proceeded to, and did, carry out the directions contained in the formal resolutions of the Seminole Securities Company certified to them, these resolutions being copy of the minutes of the meetings of the board of directors of the Southern Life Insurance Company and the Seminole Securities Company relating to this proposition and purchase. A circular letter immediately thereafter was sent out by John Y. Garlington, as president of the Seminole Securities Company, to all of those who had subscribed to the capital stock of said company, advising them of the steps which had been taken and no one objected thereto, either orally or in writing, so far as is shown by the agreed statement in the case, until rumors had been sent abroad of the high commissions which it was alleged had been paid in said transaction.

The defendant trustees were wholly ignorant as to the commissions which were actually charged (and the testimony showed they had been assured by John Y. Garlington,

president of Seminole Securities Company, that no commissions other than $2,000 were to be paid), or as to the participation of anybody in this trade other than the officers of the two companies themselves, and did not discover the same until about two months thereafter, when the defendant. W. A. Clark, being informed of the same through F. H. McMaster, Insurance Commissioner of the State of South Carolina, at once investigated the matter and ascertained that large commissions, aggregating about $70,000, had been paid and that about 700 shares of the stock purchased was not treasury stock, but had been issued to other stockholders and transferred to the Seminole Securities Company. Mr. Cooper, secretary and treasurer of the Southern Life Insurance Company, stating that while the seven hundred shares of stock had been issued in the names of other parties, that in fact it was treasury stock; that the same had been issued for the purpose of borrowing money and was then hypothecated with several banks to secure loans for the company; that the stock referred to was issued in the names of the several parties because they were endorsers upon the notes of the company upon which the loan was made.

On the 16th day of December, 1908, the summons, complaint and rule to show cause herein were served upon Seminole Securities Company and upon the defendant trustees, and on the 29th day of December, 1908, his Honor, Judge R. C. Watts, passed an order appointing receivers of Seminole Securities Company, and the trustees were enjoined from further action or connection with the company's affairs. The receivers duly qualified, and thereafter, on the 2d day of February, 1909, the following agreement was entered into by and between the receivers of Seminole Securities Company and Southern Life Insurance Company:

"State of South Carolina, Richland County.

Whereas, In order to compose and settle certain matters in dispute, the Seminole Securities Company, through its

receivers, after leave first given by the Court in the case of *Klugh et al.* v. *Seminole Securities Company et al.,* and *Southern Life Insurance Company,* a corporation under the laws of the State of South Carolina, have entered into the following agreement:

1. That a certain contract or agreement heretofore entered into by and between the Southern Life Insurance Company and the Seminole Securities Company in the month of September, 1908, whereby the Life Insurance Company received certain large sums of money and valuable securities from the Seminole Securities Company and certain stock of the Life Insurance Company was issued to the Seminole Securities Company, be declared void and fraudulent.

2. That the Life Insurance Company pay to the receivers of the Seminole Securities Company on or before the 20th day of February, 1909, the sum of one hundred and nine thousand seven hundred and eighty-five dollars at Columbia, S. C., in New York exchange.

3. That the true amount received by the Southern Life Insurance Company from the Seminole Securities Company by reason of the said transaction be fixed and determined by the Court on a reference to the master in the case of the Seminole Securities Company against the Life Insurance Company now pending in the Circuit Court of the United States for the Eastern District of North Carolina.

4. That the receivers allow a credit of thirty thousand dollars on the amount so found to be due and the balance thereof shall be paid over to the receivers by said Life Insurance Company. That the Life Insurance Company shall fully indemnify and hold harmless the Seminole Securities Company against any liability on any note or notes which may have been given the said Life Insurance Company on account of said transaction and which they are unable to turn into the Court for cancellation, it being understood and agreed that all notes given in said transac-

tion are to be turned into the Court in the case now pending, in the Circuit Court of the United States for cancellation and cancelled.

5. It is also agreed that this settlement shall be submitted to the Federal Court in and for the State of North Carolina for its approval in the case now pending therein, and further, that the decree shall provide that the Seminole Securities Company is not liable on any note or notes growing out of the transaction referred to above with the Southern Life Insurance Company, which liability it denies. The Life Insurance Company denies liability on its part on said notes, and admits that the Seminole Securities Company is not liable therefor. It is also agreed that the Seminole Securities company, through its receivers, will co-operate with the Southern Life Insurance Company to defeat any liability on account of said notes as against said Life Insurance Company. It is also agreed that the suit instituted in behalf of a stockholder of the Seminole Securities Company in the State Court of North Carolina against the Southern Life Insurance Company and Seminole Securities Company shall be withdrawn on or before February 20, 1909.

6. It is understood and agreed that all certificates of deposit received by the Southern Life Insurance Company and constituting a part of the $139,000, admitted assets received by the Southern Life Insurance Company from Seminole Securities Company, shall become under the provisions of this agreement the property of the Southern Life Insurance Company as far as the Seminole Securities Company is concerned.

7. In arriving at the amount actually received by the Life Insurance Company from the Seminole Securities Company, both parties reserve the right to review the said order of the master in said cause by appeal, and it is admitted that the Life Insurance Company received, by reason of the said transaction, $139,785, the Seminole Securities Company claiming that it received a larger amount.

In witness whereof, the parties hereto have executed the foregoing in duplicate this 2d February, 1909.

Subject to approval of Court.

Seminole Securities Company, by Frank G. Tompkins, E. J. Etheridge, R. H. Timmerman, T. W. Berry, A. M. Kennedy, R. M. Pegues, Receivers; Southern Life Insurance Company, by J. G. Shaw, Atty.

Subject to ratification by board of directors of said company."

Thereafter, on February 12, 1909, the following notice was duly served upon the attorneys for defendant trustees, with a copy of the above agreement between the receivers of the Seminole Securities Company and Southern Life Insurance Company attached:

"To Messrs. Abney & Muller and Weston & Aycock, Attorneys for the Trustees Herein, and to Messrs. Stevenson, Matheson & Stevenson and E. L. Asbill, Attorneys for Seminole Securities Company and Other Parties:

You will please take notice that the undersigned will move before his Honor, D. E. Hydrick, presiding Judge, at Camden, S. C., on Tuesday, February 16, 1909, at 12 o'clock, m., or as soon thereafter as counsel can be heard, for an order confirming and approving the settlement made by the receivers of the Seminole Securities Company with the Southern Life Insurance Company, a copy of which agreement of settlement is hereto attached. The motion will be made upon the records in the case. (Signed) Grier & Park, Nelson & Nelson, Plaintiff's Attorneys."

In accordance with the terms of said notice the proposed settlement was submitted to the Court on the 16th day of February, 1909. Counsel for the defendant trustees did not appear, and made no objection to the proposed settlement. The Hon. D. E. Hydrick, presiding Judge, then on Circuit, passed the following order:

9—103

"On motion of Nelson & Nelson and Grier & Parks, due notice having been given to the other counsel in the cause, it is ordered, that the settlement made by the receiver of Seminole Securities Company, dated February 2, 1909, a copy of which is attached to the notice of this motion, with the Southern Life Insurance, be, and the same is hereby, approved without prejudice to the right of the said receiver to proceed against any other parties to said transaction, parties to this suit to recover any loss sustained by the said Seminole Securities Company on account of said transaction if so advised. D. E. Hydrick, Presiding Judge. February 16, 1909."

No notice of filing of such order was ever served upon the defendant trustees, or any of them, or upon counsel, or any of them.

From the order of Judge Hydrick confirming the settlement the defendants, Clark, Jones and Bryan, duly appealed upon the following exceptions:

The defendants, W. A. Clark, T. S. Bryan and Wilie Jones, except to the order of his Honor, D. E. Hydrick, presiding Judge, dated February 16, 1909, for that his Honor erred in embracing within said order the following:

Without prejudice to the right of said receiver to proceed against any other parties to said transaction, parties to this suit, to recover any loss sustained by the said Seminole Securities Company, on account of said transaction, if so advised.

The error being that inasmuch as the notice given to said defendants of the application for said order, as set out in the case for appeal, stated that application would be made only "for an order confirming and approving the settlement made by the receivers of the Seminole Securities Company with the Southern Life Insurance Company, a copy of which agreement of settlement is hereto attached," the relief granted should have been confined to that of which the said

trustees were advised as aforesaid in the said notice, and it was error to include within said order the following:

"Without prejudice to the rights of said receiver to proceed against any other parties to said transaction, parties to this suit, to recover any loss sustained by the said Seminole Securities Company, on account of said transaction, if so advised; the same exceeding the relief of which these defendants-respondents were advised in the said notice."

The cause was referred to A. D. McFaddin, master for Richland county, to take the testimony and report the same to the Court. Numerous references were held and much testimony taken upon the question of whether or not the defendant trustees, Clark, Jones and Bryan, had been guilty of negligence, mismanagement or bad faith with reference to the trust undertaken by them.

The testimony was duly reported to the Court by the master, and the cause came on for a hearing before his Honor, Judge R. W. Memminger, on the 15th day of December, 1913.

The presiding Judge took the case under advisement, and thereafter filed his decree, dated February 12, 1914.

The decree is as follows:

"This cause came on to be heard by the Court Monday, December 15th, 1913. The reading of the testimony, and arguments thereon, lasted throughout the week. Mr. Stevenson, Mr. Nelson and Mr. Grier were heard on behalf of plaintiffs. Mr. Weston, Mr. Aycock, and Mr. Abney *contra.*

I took the matter under consideration, and have deliberated upon it very carefully, and feel that I can now confidently formulate my decision upon the questions involved.

By this final hearing, upon the merits, which comes before me, the three defendants, Clark, Jones and Bryan, are sought to be held, jointly and severally, liable to the stockholders of the Seminole Securities Company, upon the

ground that, acting as trustees to hold certain funds arising from the sale of stock of said company, to be applied to the formation and control of an accident insurance company, they were guilty of gross negligence and consequent breach of said trust in paying over said funds for the purchase of an alleged worthless life insurance company, with an accident feature only, being an alleged total departure from the terms of said trust, and all resulting in a loss to said stockholders (under a settlement authorized by the Court in this cause) in the sum of thirty thousand dollars.

A brief statement of the facts under which the trust arose, and this litigation followed, will lead to an understanding of the questions for decision:

Early in the year 1908, it seems that one Garlington, an insurance agent and promotor, of Laurens, S. C., and certain of his associates conceived a plan of organizing a company, to be known as the Seminole Securities Company (hereinafter called the Seminoles), the object of which was to use its funds 'to act as agent and manager for financial corporations and insurance companies of all kinds, and to buy and sell and own stocks, bonds and other securities of other corporations, both domestic and foreign' (see charter of Seminoles, dated January 9th, 1908), the first and immediate object contemplated and announced being the formation of an accident or casulty insurance company, to be known as the Sterling Accident Company (said to be a very profitable business), the stockholders of the Seminoles to derive the benefit of the profits from said accident insurance business.

In order to stimulate the sale of the stock of the Seminoles, these people, for the Seminoles, entered into an agreement with the defendants, Clark, Jones and Bryan, that one hundred thousand dollars of the proceeds of Seminoles stock sold should be held by Messrs. Clark, Jones and Bryan, all prominent business men of Columbia, S. C., and known as such all over the State, for the organization and

subsequent control of said Sterling Company; and these gentlemen, under a written agreement, the substance of which is set forth in the complaint herein, with the Seminoles, agreed to accept this money and hold it for said purposes, and it was so generally advertised and known all over the State.

Being thus equipped, and with documents showing that this trust had been created and accepted, the agents of the Seminoles would go to prominent people in every community in the State and get them interested in the enterprise, which undoubtedly was a promising one. Prominent people being thus secured in every community, others, relying perhaps upon the prominent ones whom they knew in their own community, who in turn had perhaps relied upon their confidence in the three said trustees, would take stock; and thus a very large amount of stock was sold, and approximately the agreed upon one hundred thousand dollars was deposited with said trustees.

After the sale of stock had been going on for some time, and the agreed amount was in the hands of the trustees, it began to become apparent to the organizers of the Seminoles enterprise that the expense of organizing and putting into operation a new accident company would be much greater than they had expected, and that it would take a long time to get agencies established, etc., so as to get the new company on a paying basis, and the idea was suggested and adopted that it would be far more advantageous to buy the controlling interest in a company already organized and doing business, and they began to look out for such a concern. They found it in the shape of a company in North Carolina, known as the Southern Life Insurance Company, which, under its charter and laws applicable thereto, apparently could also engage in the accident business in South Carolina. An offer was made and negotiations entered into for the purchase of the controlling interest in this company; and, it appearing entirely preferable, the directors of the

Seminoles passed a resolution authorizing and directing said trustees to make said purchase, instead of applying the money in their hands, as originally contemplated and agreed upon, for the organization of a new company. Accordingly, the details being arranged, and some investigation being made by the trustees into the affairs of the North Carolina company, resulting in the opinion of one expert that it was not an advantageous purchase, and of others that it was, the trustees, in compliance with the direction of the directors of the Seminoles, paid over the funds for the purchase of the North Carolina company to its proper officers, and the control of the same was taken over, and arrangements were commenced for opening up the accident feature of it in South Carolina.

Very shortly after the consummation of this purchase, it began to be rumored that certain agents of the Seminoles and of the North Carolina company had not acted in good faith in this purchase, but had received exhorbitant commissions from the North Carolina company out of the money paid over by the trustees, and that instead of the greater part of this money going into the treasury of the North Carolina company for treasury stock, as it was intended it should, it had been so substantially diminished by said commissions, and the finances of the purchased company were so otherwise impaired that it was on the verge of ruin. The situation was brought to the attention of the Insurance Commissioner of South Carolina, when certain of the Seminoles stockholders, becoming alarmed, rushed to their lawyers; a receivership was applied for and granted, and the crash came. A meeting of the stockholders of the Seminoles was held in the courthouse at Columbia; committees were appointed, and counsel for receivers selected. These got into touch with the officers of the North Carolina company, and an arrangement for a settlement, considered the best that could be done for all concerned, was agreed upon. The attorneys for the trustees were notified that the

Court would be applied to for a confirmation of this settlement, and this application was made before the presiding Judge of the Circuit at Camden, under said notice, and an order was taken, then and there, authorizing and ratifying said agreement of settlement, and a provision made therein that the settlement was without prejudice to the receivers to pursue their remedy, if any, against said trustees for the loss involved in the settlement; which is what is sought to be done herein, as before stated. The trustees did not appear to resist the application for the order authorizing the settlement. The loss by the settlement is placed, by the attorneys seeking to establish it, at thirty thousand dollars.

No charge of fraud or connivance is made against the trustees, but gross carelessness in buying the North Carolina company at an exhorbant price and when it was in a precarious condition, and failing to guard against the immense commissions and losses to the Seminoles; and such departure from the terms of the trust by paying the money out for a company already organized and doing primarily a life insurance business, with only an accident feature, instead of for the organization of a new and strictly accident company, as results, it is claimed, is a total breach of the trust, and consequent personal liability.

The complaint distinctly states: 'Plaintiffs do not intend to charge against said trustees any intentional or deliberate wrongdoing, or evil intent, but to charge against them conduct grossly careless and negligent, as hereinafter set forth.'

The trustees come in and deny the negligence alleged—claim that the departure from the trust agreement alleged was not substantial, was reasonably within the scope of the trust, and was really entirely advantageous. That they were duly directed to so apply the funds by those with whom they had entered into the agreement and who had the power of direction of the affairs of the Seminoles, which they were bound to obey—and furthermore that the order authorizing

the settlement by the receivers went beyond the notice of the relief that would be applied for. That they did not appear to contest the granting of an order pursuant to the notice, because they had no objection to the settlement proposed in the notice, which they understood to be a complete settlement of the litigation as against them as trustees and as defendants in the cause, but that had the notice advised them of the provision beyond the proposed settlement contained in the order, they should have been given notice of that also, and then could have exercised their right to be present and object.

Of course, this is a mere outline of the various details set out in the pleadings, and contained in the avalanche of testimony read before me, but I think it is sufficient to make clear the questions at issue, and to go more into detail in the decree would be interminable as well as useless.

Even a casual inspection of the record will show that, while the pleadings do not raise that issue, and that it is not within the scope of this enquiry, by far the greater part of the testimony on behalf of plaintiffs, is devoted to the effort to show that persons all over the State were induced to take stock in the Seminoles in reliance upon the reputation for integrity and business acumen for the trustees, who were held out to them by the agents, with the assent, both express and implied, of the trustees, that they were responsible for the funds and affairs of the Seminoles. It may be that many did subscribe upon the faith of these representations, and that it could be held that the trustees subjected themselves to liability for such reliance by conduct and correspondence, in an action for cancellation and recovery of subscription to stock, or as a defense to being required to pay same. But this is not such an action in any shape or form under all the authorities which have been cited, and the clear distinction which must be apparent from a mere statement of fact.

The complaint is not for the rescission of a contract for a subscription to stock of a corporation. The right to a rescission would depend upon the facts of each case. Hence, an action of this kind cannot be maintained by ·one subscriber in behalf of himself and others, as this action is, brought. The complaint is not for damages on the ground of deceit for obtaining money from the plaintiffs by inducing them by fraud and misrepresentation to subscribe to stock. In such case, the right to damages would depend upon the facts of each case, and one party cannot sue on behalf of himself and others where such facts may be and are variant. The complaint does not make a case for damages as against a promoter for money obtained by fraud and misrepresentation. An action of this kind cannot be maintained by one on behalf of all, because each case would depend upon its own state of facts. This action is one brought by parties claiming to be stockholders of a certain corporation, against defendant trustees, because of alleged violation of certain trusts arising out of the relation of the defendants to the corporation of which the plaintiffs are stockholders, and the trust which is alleged to have been violated, is clearly set out in paragraph two of the complaint.

Along this line it appears that the plan of the Seminoles' agents was very adroit. They first secured the names of three such well known business men as they knew would give stamina to their enterprise among prominent business- men in every section of the State. Then in every section of the State, having secured prominent local men they, upon the faith of the three State-wide prominent men, they secured others in every section upon their faith in the names of these locally prominent men so enlured. No doubt many of the stockholders whom they secured in each community did not know of Messrs. Clark, Jones or Bryan, but did know of Mr. A., or Mr. B., a local prominent man, and thus subscribed on the faith of the local man's standing, and if

the argument were to be pursued to the conclusion sought, going thus at all outside of the trust agreement, that a man should be held personally liable for a loss to a corporation upon the faith of whose name as a stockholder some one else took stock in the corporation, each community of stockholders of the Seminoles could no doubt pick out the local man whose name they relied upon as having subscribed, and hold him responsible for the loss, and leave him, in turn, to recoup himself from the person upon whom he in turn relied.

However, as already stated, this matter is not before this Court in this cause, and could not be within the scope of the allegations of the complaint, as aforesaid, and is only adverted to as, when eliminated, as shown it must be, so much of the testimony is wiped out, and the record stripped of so much extraneous and irrelevant matter.

The two real and serious questions at issue are, whether there was such a departure from the trust agreement in buying a company largely engaged in the life insurance business, instead of organizing a new company entirely devoted to accident insurance as proposed, as that the trustees must be held liable as for a breach of their trust, or whether there was such gross negligence in the handling of the trust fund and paying it out for the North Carolina company as demands the same conclusion.

As to both of these questions, of course, the burden is upon the plaintiffs to furnish the greater weight of the testimony.

In deciding a matter of this kind, this Court realizes the difficulty of viewing these transactions, not as looked back upon from our present standpoint of knowledge which has come after the consummation of the transactions, but as they were at the time and as looked forward to, yet, in justice to the defendants, this must be done, upon the principle that no argument can be made, nor conclusion drawn from a knowledge which comes after the fact. And in determining the question of legal liability, as presented here,

the facts and circumstances under which the terms of the trust were modified or changed, and the funds paid over for control in a company already doing business, and which proved an unfortunate investment, instead of, for organizing a new company, must be considered, not as looked back upon from our present standpoint, but as they appeared at the time, and as looked forward to.

A case which is very analogous to the one under consideration, and wherein there is a very lucid opinion by Judge Brawley, emphasizing these principles, is *Wheeler* v. *The Aiken Bank,* 75 F. R. 781. This case was not cited in the argument, but I have examined it carefully and have adopted the reasoning and weight of the opinion here, and, from that standpoint, am satisfied to decide that the plaintiffs herein have not shown a case wherein they should prevail.

That was a case where creditors of the Bank of Aiken, which had failed by reason of the failure of one of its largest customers, sought to hold the directors of the bank personally liable for gross negligence in making large loans to this customer even, when it was claimed, they knew, or should have known, he was in a tottering condition.

Judge Brawley refused to hold the directors liable on the ground that bad faith had not been shown, and that, viewing the transactions, as the directors did, as they appeared at the time, and not looking backward, they should not be so held, saying, among other things, in his decree: 'If there is ground to believe reasonable conformity to customs and business methods, and absolute good faith and honesty of purpose, it would be unjust to hold to a personal accountability for loans which subsequent events proved unwise. * * * In such business much depends upon trust—upon reliance upon character and business integrity, etc., which may often justify the prudence of a transaction which to lawyers, seeking to apply hard and fast rules, might seem unjustifiable and reckless. * * * In determining the question of legal responsibility therefor, as presented here, the

circumstances under which this money was advanced must be considered, not as looked back upon from our present standpoint, but as they were at the time, and as looked forward to.'

First, as to the departure from the terms of the trust, the statute law of the State is clear that directors of a corporation have charge of the making of contracts and management of the affairs of the corporation, and not the stockholders. Code 1912, sec. 2837. In this matter the trustees had before them a duly passed resolution of the directors of the Seminoles directing the change. Nor do I think the change so material as to warrant the conclusion of a breach of the trust agreement in conforming to it. The declared object of the Seminoles was to own and operate an accident insurance company. The testimony shows overwhelmingly that it was better business to acquire a company already organized than to start a new one with a small capital. It is hardly possible that any sound business man would have raised an objection to such a change of plan. In fact, a letter was sent to every stockholder of the Seminoles announcing the change, and no one appears to have objected. Furthermore, the plan, as disclosed to the trustees, was that the greater portion of the stock of the company to be purchased was treasury stock, so that that portion of the purchase money would go into the treasury of the company purchased, and only that portion necessary to buy enough of the outstanding stock to establish a control, would not enure directly to the benefit of the Seminoles. There can be no doubt but that the company purchased had the power, under its charter, to conduct an accident business, and that that feature of it was in course of organization and would have been put into operation if this crash had not come when it did.

Secondly, as to whether or not the conduct of the trustees was so grossly negligent, in the light of the knowledge they had, or could have acquired by the exercise of the care

required of them by the law, as to the affairs of the North Carolina company and Garlington and his associates, as to warrant a holding of breach of trust and consequent liability on that ground.

So far as Jones and Bryan are concerned upon this point, it may as well be stated right here that while, of course, that if liability was established for breach of the trust, they, too, could be held liable with Clark, yet, as a matter of fact, it appears clearly that they had very little to do with or knowledge of these transactions in detail. As, in almost all such cases, where several gentlemen undertake an enterprise, the control and management is left to one, who takes the lead, and to whom they entrust the details. So here, while Jones and Bryan were acting with Clark, practically the whole management of the affair was left to him, and their liability, if any was established, would be technically, for his conduct of the affair, and not because they participated actively in it.

However, now, the question is, as above stated, as to gross negligence. Here it must be borne in mind, as appears from the testimony, that Mr. Clark had known Garlington from boyhood, and knew nothing, at this time, against his business reputation. Mr. Clark is an elderly and sedate gentleman, moving only among men of his age, of quiet and temperate habits, and so could hardly have had any opportunity of being made aware of the sporting proclivities of Garlington and his crew which are hinted at as having afterwards become notorious. The enterprise presented, of a securities company owning stock in other corporations, was undoubtedly a promising one, and Garlington and his associates were undoubtedly plausible people, as it has been proved in this case that they succeeded in getting into their enterprise practically all of the most astute business men and lawyers in South Carolina, who, as a rule, are no easy marks, and many of whom were, no doubt, in a far better

position to observe the high-finance antics and sporting proclivities hinted at than Mr. Clark was.

The testimony shows that, up to the time of this receivership, Garlington bore a good business reputation in his home town of Laurens, and Mr. Cooper, the solicitor of the Laurens Circuit, a man of the highest integrity, and a keen observer of men, gave reasonable assurance of the fact to Mr. Jones. Upon enquiry, Mr. Clark had been associated with Garlington in the Carolina Agency, an enterprise of Garlington's for capitalizing his Laurens insurance business, and that was not progressing satisfactorily, and it is insisted in the argument that Garlington's conduct of that enterprise, and using his equity in his stock in that enterprise to organize the Seminoles (making the stock of the Seminoles, to that extent, 'wind plus wind,' as Mr. Stevenson aptly puts it), should have advised Mr. Clark of his unreliability, and kept him more upon the alert throughout the Seminoles transaction.

The Supreme Court Reports will show that this Court, upon a complaint and affidavit showing, in a proceeding brought by some of the counsel for the plaintiffs herein, for a receivership of the Carolina Agency, took the view that such showing established a *prima facie* case of gross negligence by these same gentlemen in that matter, and the Supreme Court affirmed the finding. Yet almost four years have passed since this Court appointed the receiver in that cause and it appears that absolutely nothing has been done to substantiate the showing then made, from which this Court may well infer (being well aware of the diligence and ability of the counsel and the receiver) that such evidence is not available, and that that case is but another instance of a case wherein 'the force and vigor of the war has fallen far short of the fine phrases of the manifesto.' (See *Chisolm* v. *Carolina Agency*, 88 S. C. 438, 70 S. E. 1035.)

No doubt Mr. Clark was disappointed in Garlington's conduct in the Carolina Agency' matter, but it does not

appear that was enough to show that he should then and there have severed all business relations with him and refuse to go on with him in another and distinct and promising enterprise, wherein he was to do nothing more than hold certain funds as trustees, as set out in the said trust agreement, and act, as of course he would have to do, under the direction of the directors of the Seminoles, the creators of the trust. Now, then, were the affairs of the North Carolina company in bad condition, and the price paid therefor so high as that, in the light of the knowledge which the trustees had, or should have had, it was gross negligence to obey the mandate of the directors of the Seminoles and pay out the trust fund for the purchase of the company.

It is possible that upon this point the testimony shows that these trustees went beyond the duty of which the law required of them, because they did make reasonable investigation upon these points.

Of course I do not think that even the statute law referred to would have justified them in going ahead blindly, and in utter disregard of obvious known facts, obeying the resolutions of the Seminoles directors, but it was certainly not their duty to go to the extent, before complying with the resolution, of making an exhaustive research of the wisdom and feasibility of the enterprise and the financial condition of the company proposed to be bought and get the unanimous opinion of experts that it was all right, and if they decided that it was an unwise purchase to set up their judgment and decision to that effect and refuse to comply with the resolution. Under the law their duty, as trustees, in this respect, was only to conduct the trust as ordinarily prudent men, in good faith, and with common skill. *Wilson* v. *Bradley,* 16 S. C. 517; *Hext* v. *Porcher,* 20 S. C. Eq. (1 Strob. Eq) 171; *Boggs* v. *Adger,* 25 S. C. Eq. (4 Rich. Eq.) 408.

These trustees consulted several experts about the purchase; one thought the price was too high, others differed

with him and thought the purchase a good one.   Mr. Miller, a well known and highly honorable insurance man of Columbia, thought the price too high, but he was not taking into consideration that a large portion of the purchase money was to go into treasury stock.   The directors of the Seminoles had directed the trustees to consummate this purchase.   The investigation showed at most a difference of opinion among experts (a very ordinary thing among experts) as to the wisdom of the purchase; the opinions for the purchase outnumbering the one against it. The officers of the company proposed to be purchased were apparently reliable men.   They had been placed in their positions by a board of directors of more than twenty North Carolina business men, some of them known to Clark by reputations to be good men, and all of them conceded by the testimony in this case to be men of good character and business standing.   No motive has been shown, nor reason suggested, why these trustees, or any of them, should have been moved to exercise anything but good faith and due care in performing the trust.   The allegations of the complaint and the record absolve them from wilful wrong, and it has certainly not been shown that it was to their interest to buy worthless company or to prefer to buy a company instead of organizing a new one, whereby it might be inferred their vigilance would have been relaxed.   It appears to be suggested that Mr. Clark was to be president of the new company when organized, or of the purchased company when the Seminoles got control of it.   If it was so that he was to be president or any other salaried officer, certainly then it was more to his interest that the purchase should be of going, live concern than of a wreck.   In fact, therefore, the whole interest of the trustees, especially of Mr. Clark, the one having especial control of the details, was that that should not happen which did happen, to wit, a catastrophe.   And if it be true that men are more moved by motives of self-interest than by any other power, then

certainly here we have all the incentive towards a great care in seeing that this enterprise should be a success.

As to whether or not the enterprise would have resulted in failure, had not the hands of the trustees been tied by the receivership, and all efforts on their part to effect a better settlement and keep the concern going, notwithstanding the losses sustained, it is not for this Court to say. It does appear, however, that perhaps the clamor of the frightened stockholders of the Seminoles was premature, as when it came to proving the sweeping allegations of their skillfully drawn bill of complaint, under which the receivership was obtained, but one of the four complainants appeared to testify, and out of the hundreds of stockholders, on behalf of whom the action was brought, but six in all were sworn before the master, and the testimony of none of them has serious bearing upon the questions here at issue.

As to the terms of the order confirming the settlement by the receivers going beyond the terms of the notice, as set out and claimed as a complete defense in the answer, this Court was impressed with the apparent substance and justice of the defense, but under the cases in this State it appears that it is not available herein, as the only remedy therefor was by appeal from the order. See *DeWalt* v. *Kinard,* 19 S. C. 296; *McMahon* v. *Pugh,* 62 S. C. 506, 40 S. E. 960.

In the meanwhile, up to the time of this decision, the funds secured for the stockholders under the settlement, have been collected and distributed, the learned counsel have received their fees—Garlington and Young, one of his associates, have been convicted and pardoned—Herbert, one of the alleged wily agents and alleged recipient of grossly excessive commissions, has been tried and acquitted, and indictments were sought against the trustees and ignored by a grand jury—the jangling and clamor of the stockholders' meeting, held at the time of the receivership so many years ago, in this very court room, where this hearing before this

Court was held, had subsided to a calm, deliberate hearing by the Court, upon a written record, largely of prosy documentary evidence, before an audience of one or two somnolent Court bailiffs. Indeed, it appears to this Court, viewing the whole record and deciding the cause upon the facts and principles of law announced that it well may write, as it hereby writes, as an epitaph upon the tomb of this litigation—'*Dulce et decorum est quod Deus finem omnibus dedit.*' "

Judgment was duly entered upon the decree of the Court in favor of the defendant trustees, Clark, Jones and Bryan, from which judgment the plaintiffs herein appeal to this Court to reverse the judgment of the Court below upon the following exceptions:

"1. That the Court erred in not holding that the trust imposed upon and undertaken by the trustees, Clark, Jones and Bryan, under the terms of the trust agreement which was in evidence, was an express trust, and the said trustees were liable for any loss arising from any modification, variation or departure from said trust agreement without regard as to whether there was any negligence, mismanagement or bad faith on the part of said trustees."

"2. That the Court erred in not holding the defendant trustees, Clark, Jones and Bryan, liable in the sum of thirty thousand ($30,000) dollars and in not rendering judgment against said trustees for said amount; the error being that it appears conclusively that under the settlement between the receivers of Seminole Securities Company and the Southern Life Insurance Company (which said settlement was approved by the Court after due notice to said trustees of said proposed settlement, and without protest from them), the said receivers received thirty thousand ($30,000) dollars less than was admitted to have been paid to the Southern Life Insurance Company in the purchase of its capital stock, and said purchase having been made in violation of the

terms of the trust agreement, or under an alleged modification of said trust agreement, the trustees are liable for said loss without regard to whether or not they were guilty of negligence or mismanagement in making said purchase, or in paying over to the said Southern Life Insurance Company the moneys and assets of Seminole Securities Company held by them as trustees."

*Messrs. Nelson & Gettys,* for appellants, submit: *That when a trustee departs from the directions contained in the trust instrument, he is liable for any loss occasioned, irrespective of good faith or his best judgment:* 39 Cyc. 293-296; 28 A. & E. Enc. of L. 1063; Perry, Trusts and Trustees, sec. 460, 475; 1 S. C. 421; *Ib.* 452. *Rights of beneficiaries once vested cannot be changed by creator of the trust:* 39 Cyc. 92-93; 3 Strob. Eq. 371. *Burden of proof on trustees to discharge themselves:* 1 Cyc. 448; 46 S. C. 146; 74 S. C. 476; 42 S. E. 904; 45 S. C. 667; 47 S. E. 205.

*Messrs. Grier, Park & Nicholson,* also for appellants, cite: *As to power of directors to change terms of trust contract:* 2 Thomp. Corp. (2d ed.), sec. 1187; 85 U. S. 233; 39 S. C. 51; 69 S. C. 183. *Effect of settlement:* Perry, Trusts (2d ed.), sec. 850; 9 S. C. 490.

*W. F. Stevenson,* also for appellant: *Could the directors change the application of the trust funds from the purpose designated in the trust agreement to the purpose to which it was applied?* 12 L. R. A. (N. S.) 558, 559, 561 and 563; Clarke & Marshall on Principals of Corporations, vol. III, sec. 631b, 631f, sec. 275a; Cook on Corporations (5th ed.), sec. 501; Moraywetz on Corporations, sec. 1097; 1 Beech on Private Corporations, sec. 40; 4 Thompson's Commentaries on Law of Corporations, sec. 5417; Black on Constitutional Law, page 535; Spalding on Private Corporations, sec. 1028. *The next question is, were*

*the trustees the owners and holders of this fund, and if so, could they submit to the diversion of the fund without themselves becoming liable? The fund was placed in their hands for a special purpose, to be invested for the benefit of the stockholders of the corporation, and under the case of Ward v. Davis, 3 Sandford, and Horne v. Myer, 29 Ohio L. J., 403, they were the legal owners of the fund for specific purposes, and if they parted from the same for another purpose, they are responsible to the cestui que trusts:* 40 L. R. A. 218. *On the subject of their liability in assisting to promote a corporation on representations which they wilfully failed to carry out:* 29 L. R. A. 63; 7 A. & E. Encyclopedia of Law (2d ed.) 746; 28 *Id.* 1048, 1060, 1065, 1069, 1070; 18 N. J. Eq. 462, DeS. Eq. 446; 60 S. C. 381; 53 S. C. 419. *The defense relies on the position that the receivers have compromised the matter with the Southern Life Insurance Company, and thereby released them from liability from loss. This raises the question of res judicata. The trustees were before the Court; the Court confirmed the question by a decree, of which due notice was given the parties, and they raised no question. They cannot be heard now to say that the finding that that was a good settlement was wrong:* 6 Richardson's Equity 305-6; 49 S. C. 566; 33 S. C. 504; 32 S. C. 511; 9 Richardson's Equity 369; 24 A. & E. Enc. of L. 740.

*Messrs. Weston & Aycock,* for Wilie Jones, respondent, submit: *Original plan was impossible of performance to the letter:* Code, sec. 2837; 46 S. C. 372; 84 S. C. 318. *The plan followed substantially carried out plan:* 89 S. C. 545; Code, sec. 2850; 53 N. E. 711. *The Seminole Securities Company was the beneficiary:* 28 Ency. 1101. *Its stockholders were not:* Code, sec. 2812; 56 Am. St. Rep. 401. *Power of directors:* Code, sec. 2837; 139 Mo. 1; 61 Am. St. Rep. 436; 65 S. C. 45; 17 Enc. (1st ed) 87; 30 S. C. 428; 2 Strob. Eq. 148; 36 S. C. 322; 26 S. C. 370; 120

N. Y. App. Div. 399; 186 Mass. 14; 104 Am. St. Rep. 550.
*Effect of settlement:* 19 S. C. 294; 100 Am. St. Rep. 401;
4 S. C. 85; 86 S. C. 217.

*Mr. B. L. Abney,* for Messrs. Clark and Bryan, respondents, argued the case orally: *The Seminoles Securities Company had already been organized in accordance with the laws of the State and a charter issued, January 9, 1908. It is not a case of promoting the formation of a corporation. While in this state of complete organization, the agreement with the defendants was made. It is admitted that the power existed in the board of directors to make such contract. The directors of such corporation were vested with the entire management of the business of the corporation. The stockholders could neither authorize nor make a contract with third parties with regard thereto. Such power is exclusively in the board of directors:* Section 2837, vol. I, Code of Laws 1912; Morawetz on Corporations, 7th ed., par. 511, par. 243, and cases cited; Cook on Corporations, 7th ed., pars. 709, 712; 135 N. Y. Supp. 210; 68 S. C. 103; Thompson on Corporations, sections 3974, 3975; 21 A. & E. Encyc. of Law, p. 863; 10 Cyc., p. 758; Beach on Private Corporations, sec. 232; 61 A. S. R. 436; 97 Fed. 843; 2 L. R. A. 648; 27 Fed. 821; 2 Colo. 585; 33 Cal. 11. *The board of directors are the agents and trustees of the corporation. The money paid in upon stock subscription was the money of the company and not that of the stockholders. The defendant parties to the contract could not deal with the stockholders, but with the board of directors—the other party to the contract. The stockholders, as such, were not beneficiaries—the corporation was the beneficiary of any trust created. Hence, the parties to the contract could alter or modify the same unless there was combination and bad faith or such lack of care as to indicate such. It is by the agreed statement of facts and the findings of the Judge, admitted that no such bad faith or improper care, combina-*

tion or conspiracy entered into the action of the trustees.
Like all contracts, the parties to it can modify them or alter
them, unless other parties had become a beneficiary under
the contract as completed: Cook on Corporations, 7th ed.,
sec. 709, page 2423. The corporation being both the maker
of the contract, through its agents or trustees—the board of
directors—was the beneficiary of the trust created. The
trustees, the other party to the action, could alone deal with
the board of directors, and not with the stockholders.
Hence, the right existed in the absence of bad faith or such
lack of care, as to indicate bad faith, the corporation, acting
through its directors, could alter or modify the contract even
against the wish of the stockholders, their remedy being
against their disloyal directors: 8 N. Y. Supp. 46; 75 Fed.
433; 91 Am. Dec. 672; 58 Am. Dec. 439; 35 Am. Dec. 395;
20 Blatchf. C. C. 142; 135 Mass. 369. They had full
knowledge, by the letter sent out to all by the president of
the company of the contemplated change. The trustees had
no knowledge or intimation of bad faith upon the part of the
board of directors. Acting themselves in good faith, the
contract was modified. There was no change or action
contrary to powers conferred by the charter, nor violation
of any inhibition or limitation in the charter with regard to
its charter right to do business. Cases cited by appellants
not applicable because they refer to the stockholders or
board of directors going beyond the power conferred by
charter. Upon the admitted and conceded facts as agreed
to and found by the Circuit Judge, the authority existed
with the board of directors to make the contract; they alone
could alter or modify it on the part of the corporation or the
stockholders. The defendants having no knowledge of any
intention of bad faith upon their part towards their corpora-
tion or its stockholders and exercising due care to see that the
proposed alterations were proper, violated no duty by con-
senting to such modification or alteration in the trust agree-
ment.

January 5, 1916.

The opinion of the Court was delivered by MR. JUSTICE, GAGE.

This is a cause in equity and a single question is made by the appeal. Remotely it is, are the defendants, Clark, Jones and Bryan, personally liable to the stockholders of the Seminoles Security Company for $30,000.00 for a breach of trust?

The Circuit Court found that they were not, and we agree.

It is not necessary now to write down the history of the ·defunct Seminole Company, and we shall not undertake it.

It suffices to recite the cardinal features of the enterprise from its inception to its dissolution.

The charter of the company was granted 8th January, 1908.

The authorized capital stock was $300,000.00. The subscribed capital was $270,000.00. The cash paid in capital stock was $97,928.87 or more. The trust agreement was executed 31st January, 1908. The stock in Southern Life was bought 3d October, 1908. Action for a receiver was begun 16th December, 1908. A receiver was appointed 29th December, 1908. A settlement with Southern Life was made 2d February, 1909. That settlement was, approved by the Court 16th February, 1909.

The enterprise, therefore, ran its whole career within a twelvemonth.

This action is sequel thereto.

A few other essential facts need to be stated.

The plaintiff stockholders are amongst those who undertook to hoist this enterprise. They, the complaint alleges, paid to the solicitors of stock one dollar per share which was its par value, and a premium of fifty cents per share. It does not appear from the case how much stock was subscribed for before the trust agreement was made and how much was subscribed for after that event.

It is true Garlington and his immediate associates were the initiators of the scheme, but the plaintiffs and all the stockholders stood by like Saul consenting to the death. And they are those now complaining against Clark and Jones and Bryan because the scheme failed.

There is no allegation and no evidence that Clark or Jones or Bryan held any stock, or took any hand in the suggestion or direction of the Seminole Company or received any compensation thereabout. The only contention is they held the bag which had been filled by the stockholders. Amongst other things the Seminole Company was: (1) "To act as agent and manager for financial corporations and insurance companies of all kinds: and (2) to buy, sell and own stocks, bonds and other securities of other corporations, both foreign and domestic." That was to be the chief business of a company these stockholders got up. It was to manage the business of other corporations, which are required by law to manage their own business.

As the Circuit Court found, there may have been amongst the stockholders some persons who had no more wisdom than to put money into such an enterprise; but there were many who were not beguiled.

The complainants suggest that "the real purpose of the appointment of the said trustees was to lend tone, standing and credit to the *scheme of the managing officers* of the said defendant company, and influence the unsuspecting public to become subscribers to its capital stock." (Italics are added.)

That is to say, the president and directors of the Seminole Company, "the managing officers," put forward Clark, Jones and Bryan to mislead the public. But the stockholders put forward the managing officers as their representatives, and the scheme of these managers was thus made possible by the act of the stockholders. The stockholders vouched for Garlington; may they now say Clark, Jones

and Bryan could not? If, therefore, these stockholders have been caught, it is in a trap of their own setting.

So, the question is, ought the trustees, mere volunteers without pay, and with no interest in the Seminole Company, to be made to respond to such complainants for $30,000.00 alleged to have been lost by the conduct of the trustees?

The complainants charged the trustees with "reckless conduct," but acquitted them of "intentional wrongdoing."

The Circuit Court found there was no proof of fraud on the part of the trustees; and the plaintiffs have not gainsaid that.

The cardinal duties, and, therefore, liabilities of trustees are these: (1) To carry out the trust; (2) to use due care thereabout; (3) and to act in good faith thereabout. Pomeroy's Eq., sec. 1061. These duties will be considered in an inverse order from that stated.

It is conceded by the complaint and by the plaintiffs' argument, that so far as the trustees are concerned, "this thing was not done in a corner;" so that the element of bad faith on their part is eliminated from the case.

It is true, a trustee must exercise about the performance of his trust due care, and he must do that independently of the question of good faith. But the law does not exact of the trustee the exercise of extraordinary care. If he is a man of common prudence, and used that prudence about his own business, he is not required to use more than that about his neighbor's business, which means the business of his *cestui que trust*.

Whether or not the trustee did so exercise common prudence in a particular case is a question of fact, and the answer depends upon that measure which the Chancellor may apply.

In the instant case the only duty of the trustees was to be reasonably certain that the thing they were paying out the fund for was valuable.

The testimony proves that the stock of the Southern Life was then thought to be worth much more than the trustees paid for it. There is none to the contrary.

There is no testimony to show that the trustees knew or had reason to believe that the price agreed upon for the Southern Life was too much, but the contrary. They looked into the transaction, and concluded upon the words of reputable men in North Carolina, about which there is no dispute, that the thing bought was worth more than the price paid for it.

Notice in writing was given by the directors of the Seminole Company to the stockholders of the Seminole Company of the pendency of the transaction, and the stockholders did not oppose its consummation.

It is true odor was lent to the transaction by the allowance and the payment of an exorbitant commission for the sale of the stock of the Southern Life to the Seminole Company.

But the trustees had no intimation of such a feature of the sale; and the record does not reveal to whom that commission was paid, or out of what fund it was taken; it was not taken from the trust fund. There is nothing in the testimony to charge that transaction to the negligence of the trustees, and it cannot, therefore, affect the question of their due care.

We are, therefore, of the opinion that the trustees were not so lacking in care about the payment of the fund as to make them personally responsible for any loss which may have resulted from their act.

The most complex issue has been reserved for the last, and that is, did the trustees unwarrantably depart from the terms of the trust?

It is true the trust was express, and it is also true the trustees were bound by the law to conform to the terms of it, and for a failure to do so they are liable to the *cestui que trust* in the event of a loss of the fund.

This enquiry is distinct from that of ordinary care by the trustee, and from that of good faith by the trustee.    Manifestly a trust agreement, like any contract, may be modified by all the parties in interest.

The agreement here is out of the ordinary; it is a contrary device; and its meaning and the purpose of the Seminole Company in its making are not manifest.

One thing only is apparent, and that is, the now amazing gullibility of the three seasoned and reputable business men who consented to enter into such an agreement.

Their action proves that like that noble animal, the horse, man is a "vain thing for safety."

8      The parties to the contract are the Seminole Company and Clark, Jones and Bryan.

The former was a corporation with an authorized capital stock of $300,000 and a subscribed capital stock of $270,672. And the Seminole Company was to organize an Accident Insurance Company with a capital stock of $100,000, all of which was to be subscribed for, owned and controlled by the Seminole Company.    And the stockholders in the Seminole Company were, by virtue of their status as stockholders, to enjoy such profits as the Accident Company might make for the parent company.

One of the expressed objects of the trust contract was to safeguard the subscribers to the capital stock of the Seminole Company.

On that clause of the contract the chief argument of the plaintiffs is built.

Had the trustees been able to follow the words of the instrument; had they waited until the Seminole Company had organized an Accident Company and subscribed for all the $100,000 of stock in the Accident Company, then the trustees must by agreement have still paid into the hands of the Seminole Company the $97,928.87 which they held. What, then, would have been the improved plight of the subscribers who supplied the above sum of money?

By the trust agreement it was provided: "It is the purpose of the said Securities Company (the Seminole) to promote and finance the said * * * Accident Company, the *capital stock* of which said company shall be *owned* and *controlled* by the said Securities Company."

The real owners, then, of the $97,928.87 would have been not those who supplied it, but the Seminole Company. The subscribers to and payers of capital stock in the Seminole became entitled to share in whatever profits the Accident Company might make, only because they were stockholders in the Seminole Company. The very agreement expressly so provides, in the next clause after that above quoted.

If, therefore, the Seminole Company was to own the Accident Company, and if the trust fund was to constitute the corpus of the Accident Company, then the real beneficiary of the trust was the Seminole Company, and it was within the clear power of the Seminole Company to modify the trust agreement, and direct the trustees to pay the fund to a company other than that named in the agreement.

It was not of the essence of the trust agreement that the Accident Company to be organized should be called the "Sterling Accident Company;" nor we think was it of essence of the trust agreement that the Seminole Company should "organize" an accident company instead of buying one. The power to do one implies the power to do the other. More than this, the Seminole Company was authorized by its charter to buy stocks of other corporations. And its action in buying the Southern Life may be referred to such power; but it is not necessary to resort to that view to sustain the transaction.

But it is argued by the plaintiffs, that the trust agreement stipulated that the Seminole Company should own the entire issue of the capital stock of an accident company, and that the transaction it entered into with the Southern Life did not make it sole owner of the Southern Life.

That is true; but such a provision is no more unchangeable than the other which bound the Seminole Company to organize the Sterling Accident Company. The appellants' whole argument amounts to this, that the trustees were by the contract representatives of the individuals who paid the $97,928.87.

As before stated that is not true. The Seminole Company owned the stock of the proposed Accident Company, and was in law and fact the real beneficiary under the deed; and if the trustees had undertaken to vote the stock of an accident company, they would have done so as trustees for Seminole Company, the owners of it.

It was beyond the power of the Seminole Company to organize, own and direct an Accident Company as a separate corporate entity from the Seminole Company. Nobody denies that. The subscription of the plaintiffs was to the capital stock of the Seminole Company, and the money they paid was a payment on that subscription.

The trust contract made by the Seminole Company to dedicate $100,000 of the so subscribed money to the stipulated end, was a vain thing. The money paid became stock in the Seminole Company, and was subject to control of the directors of the Seminole Company.

When the trustees found themselves in this predicament, it surely would have been a wiser thing for them to have gone into a Court of equity and craved its direction in the premises. But if the other party to the trust contract was unable to execute its provisions to the letter, and was able to modify the terms of the contract, the trustees ought not to be held personally liable, under the circumstances of the case.

We conclude, the stockholders of the Seminole, the plaintiffs amongst them, got up the corporation, set it agoing and named the directors. It was on its face a balloon floated by hot air.

These directors, who made the contract with the trustees, had the power to modify it; to buy stock in an existing company instead of organizing a company; and to permit the trustees to take a part, and not all, of the stock of an accident company.

If the stockholders in the Seminole have been deceived, it has been by the action of men they put forward to represent them, to wit, Garlington and his confederates.

The event proves that those hitherto unknown and untried men hoisted a scheme which neither their stockholders nor trustees understood; and which, but for the timely initiative of the plaintiffs themselves, and the bold action of the Court to which they went, might have wrought serious damage.

This conclusion renders it unnecessary to consider the effect of the compromise agreement which the receivers made with the Southern Life, and which the Court approved.

The judgment of the Circuit Court is affirmed.

Mr. Justice Watts concurs in the opinion of the Court, announced by Mr. Justice Gage.

Mr. Justice Fraser, *dissenting.* The Seminole Securities Company obtained a charter that enabled it "to act as the agent and manager for financial corporations and insurance companies of all kinds; to buy, sell and own stock and bonds and other securities of other companies, both domestic and foreign."

The capital stock was not to exceed three hundred thousand dollars. The face value of the shares was to be one dollar per share. The management of the company seemed to have thought that it needed something to inspire the confidence of the investing public and executed the following deed of trust:

"Memorandum of agreement made and entered into this 31st day of January, 1908, by and between the Seminole Securities Company, a corporation duly incorporated by and

under the laws of the State of South Carolina, and herein-
after called the Securities Company, the party of the first
part, and Washington A. Clark, Wilie Jones, Thos. S.
Bryan, hereinafter known and referred to as trustees, all
of the city of Columbia, party of the second part, wit-
nesseth:

Whereas, The Securities Company, under charter derived
from the State of South Carolina, is authorized and
empowered to engage in certain mercantile and financial
pursuits, and, among other things, to promote and finance
other corporations; and,

Whereas, The Securities Company is authorized to issue
capital stock in an amount not exceeding $300,000 in the
form of —— shares of —— each, and for this purpose is
now offering stock for sale; and,

Whereas, It is the purpose of the Securities Company as
soon as $100,000 of capital stock shall have been subscribed
and paid in, then to proceed to organize an accident com-
pany, to be known as the Sterling Accident Company, the
said company to be incorporated by and under the laws of
the State of North Carolina or the laws of some other
Southern State; the object and purpose of which said acci-
dent company shall be to write and issue accident insurance
and other cognate or collateral insurance; and shall be
organized upon a basis of a capital stock of $100,000—all
of which shall be fully paid up, the same to be subscribed
and paid for and taken by the said Securities Company;
and,

Whereas, It is the purpose of the said Securities Company
to promote and finance the said Sterling Accident Company,
the capital stock of which said company shall be owned and
controlled by said Securities Company; and,

Whereas, It is understood and agreed that the subscribers
to the capital stock of the Securities Company shall thereby
become interested in the capital stock of the said Sterling
Accident Company and thereby participators in the profit

and benefits which shall grow out of the operation of said company; and,

Whereas, In order to insure and safeguard the subscribers to the capital stock of the said Securities Company, it is proposed to place so much of the funds arising from the sale of the stock of the Securities Company as may be necessary to purchase and pay for the entire issue of capital stock in the Sterling Accident Company, to wit, the sum of $100,000, and such further sum as may be necessary to pay for any premium upon bonds which may be purchased as hereinafter provided for, in the hands of trustees to be hereinafter named; and when the .said Sterling Accident Company shall have been fully organized, then to invest the funds so placed in the hands of said trustees in such State, corporate or municipal bonds as may be required by the authorities of the State wherein the said company shall be organized, to be deposited and pledged under its act of incorporation; and, further, to place the entire issue of stock in the said Sterling Accident Company in the hands of said trustees for a period of not less than ten years, giving and granting unto the said trustees the exclusive power of voting the same at all elections;

Now, therefore, we, the Seminole Securities Company, in consideration of the premises and in consideration of the sum of $1.00 to us paid by the said trustees, do hereby nominate, constitute and appoint the said Washington A. Clark, Wilie Jones and Thos. S. Bryan, trustees, and do hereby covenant and agree to deposit with the said trustees, as the same shall be collected, the funds which shall arise from the sale of stock in the Seminole Securities Company, in an amount which shall be sufficient to pay for the $100,000 of capital stock to be subscribed and paid for in the Sterling Accident Company, and such further sum as may be necessary to pay for the premium on the bonds to be deposited as hereinafter referred to, the same to be held by the said trus-

tees upon the following trust and for the following purposes, viz.:

1. In trust to hold the said funds as the same shall be paid over to the trustees and deposit the same in some approved national bank or bank (*sic*) at interest upon the most favorable terms.

2. And when the said funds so deposited shall amount to the sum of $100,000, then on behalf of the said Securities Company to invest the same in a like amount of capital stock of the said Sterling Accident Company, which shall have been subscribed for by the said the Seminole Securities Company. And upon further trust from time to time as the said funds shall be received and turned over to the trustees to invest the same in such State, corporate or municipal bonds as may be agreed upon, and such as shall be required under the laws of the State wherein the said Sterling Accident Company shall be incorporated; which bonds, when so purchased, shall be held upon like trust to be used by the said trustees in behalf of the said Seminole Securities Company in the payment of stock in the said Sterling Accident Company, and on behalf of the said Sterling Accident Company to be pledged and placed with the proper State authorities wherein the said Sterling Accident Company has been incorporated, under the provision of the laws of the said State.

And the said Securities Company agrees that the entire issue of the capital stock of the said Sterling Accident Company, when issued, shall be placed in the hands of said trustees to be held by them for a period of ten years. Giving and granting unto the said trustees full power and authority at their stockholders' meetings, whether regular or special, to vote upon all questions which may arise, as in their judgment shall best subserve the interest of the stockholders of the said Sterling Accident Company; and also at all annual meetings to vote for such board of directors of the said Sterling Accident Company as shall, in their judgment, best

11—103

subserve and most safely protect the interest of the said stockholders.

And we, the said Washington A. Clark, Wilie Jones and Thos. S. Bryan, trustees as aforesaid, hereby agree to accept the said trust and to do and perform all of the duties herein imposed upon us as trustees in behalf, both of the stockholders of the said the Seminole Company and the stockholders of the Sterling Accident Company.

In witness whereof, the said Seminole Securities Company has caused these presents to be executed by John Y. Garlington, its president, and J. S. Young, its secretary, and the corporate seal thereof to be attached; and the said trustees have each, in their own behalf, affixed their hands thereto the day and year above written.   Seminole Securities Company, by John Y. Garlington, President; J. S. Young, Secretary.   Signed, sealed and delivered in the presence of Paul A. Cooper, James J. Robb, witnesses as to signature of Jones, Clark and Bryan.   Wilie Jones, W. A. Clark, T. S. Bryan.   M. G. Jeanes, W. H. Antrum, Jr., witnesses as to Garlington and Young."

The Circuit decree finds that Gen. Jones and Mr. Bryan are inseparably bound with Mr. Clark, and from this finding there is no appeal.   Mr. Clark wrote a circular letter setting out the terms of the trust and this letter was used to secure subscriptions of stock.

The trustees set about the preparation of the preliminary work of creating the Sterling Accident Company, but before they had proceeded very far, the Seminole Securities Company, through its directors, made a contract with Southern Life Insurance Company of Fayetteville, North Carolina, for the purchase of a majority of its stock.   This life insurance company had life policies issued to the extent of about five millions of dollars.   The life insurance company had the right, under its charter, to do an accident insurance business, but at the times herein referred to had issued few, if any, accident policies.   At this time the trustees had in their

hands $97,928.87 of the $100,000 trust funds. The trustees, Clark, Jones and Bryan, were directed by the directors of the Seminole Securities Company to pay over the trust fund to Southern Life Insurance Company in part payment of the purchase money of the stock. This fund, together with other funds retained by the Seminole Securities Company, made up the cash payment demanded by Life Insurance Company. The total amount to be paid for the stock was $325,000. Terms cash, $162,500, notes for balance of $162,500 payable in one year, secured by an assignment of the stock purchased.

The trustees, believing that they were bound to obey the orders of the board of directors of the Seminole Securities Company, turned over the funds held by them to complete the purchase of this stock. Soon after the sale was consummated, it was discovered that large commissions, to wit, about seventy thousand dollars, had been paid to agents who negotiated the sale. The trustees protested, and the stockholders brought suit for accounting against the trustees, an injunction against directors of the Seminole Company and asked for the appointment of a receiver. Receivers were appointed. The receivers and Southern Life Company agreed upon a settlement of their differences and gave notice to the trustees that they would apply to Judge Hydrick (then Circuit Judge) for an order confirming the settlement. The trustees allowed the hearing to go by default.

1. The order confirming the settlement concluded as follows: "Without prejudice to the right of the said receiver to proceed against any other parties to said transaction, parties to this suit to recover any loss sustained by the said Seminole Securities Company, on account of said transaction, if so advised."

From this portion of the order the trustees appealed. The exception that raises this question can not be sustained. The record shows that the trustees were served with a copy of the proposed settlement. The office of trustee imposes

an obligation to execute the trust and for failure to do that duty the trustee renders himself liable.   If the settlement was a good one, they should have been present to urge its approval, and if the proposed settlement was bad, they should have been present to oppose it.   Parties who are in default can not be heard to say they did not consent until the default is set aside by proper proceedings.   Besides this, the portion of this order appealed from created no right and destroyed no right.   It merely declared that it did not prejudice the right to proceed.   It simply confined the effect of the order to the matters set up in the notice.

2.  The Circuit Judge who heard the case on Circuit, found that the trustees were bound to obey the orders of the directors of the Seminole Securities Company under the statute of this State, and held that the trustees were not liable for any loss that the stockholders suffered.   The first exception questions this holding.   By reference to the contract set forth in the first part of this opinion and the record in the case, it will be seen that the Seminole Securities Company agreed to set aside one hundred thousand dollars of its three hundred thousand dollars of capital, and put this amount in the hands of three trustees of known integrity and financial skill; that these three gentlemen were to organize an accidental insurance company to be called "Sterling Accident Company," that they were to subscribe and pay for "all the stock in said Accident Insurance Company."   That they (the trustees) were to vote the stock, appoint the directors and hold the stock for ten years.   The trustees not only accepted the terms of the trust, but through Mr. Clark, wrote a circular letter setting forth the terms of the contract.   After this had been done, the soliciting agents proceeded to sell the stock.

It is undisputed in this case that the circular letter tended to procure subscriptions to the stock.   The face value of the shares was one dollar per share, but the agents sold it for one dollar and a half per share.   The extra fifty cents per

share over its face value has nothing to do with this case as it did not go into the treasury or the hands of the trustee, except to show that there was supposed to be some peculiar and unusual advantage in the ownership of the stock of the Seminole Securities Company.

Three inducements to the purchase of this stock are claimed in the record:

1. Accident insurance, in which the profits are very large.

2. The personal and financial ability and integrity of the trustees.

3. The guaranteed management by these trustees, for a term of ten years, of the one hundred thousand dollars.

There are three kinds of insurance with which our people are accustomed to deal: (a) life; (b) fire; (c) accident.

In life insurance, every man insured will die. Whether the death will be a loss to the company or not depends on the insured, and not on the company.

In fire insurance the loss is not so certain, as some houses stand for a hundred years and then the policies are of short duration and may be cancelled after a short notice, if desired by the companies. In accident insurance, the danger of loss is very small.

The fund was diverted from the smallest to the greatest liability. There was not a single provision of the trust executed. While the Seminole Securities Company collected more than one hundred thousand dollars, the trustees did not get possession of the full amount, nor does the record show that they made any effort to do so. They did not even demand it. They did not organize an accident company as they agreed to do; they did not keep possession of what they did get. The stock was to be kept free and unencumbered except for its accident policies and they assumed the liabilities of a life insurance company to the extent of five millions dollars. They then pledged the stock, they did get, for more money that the Seminole Security

Company had any expectation of getting, or right to get by twenty-five thousand dollars. There is no question of fraud. The complaint distinctly disavows it.

It makes no difference how honest the trustees are, or how firmly they might have believed that they were bound to obey the orders of the directors, the result has been that they surrendered trust funds they had agreed to keep and manage. A part of it has been recovered by the receivers.

The question in the case is,—Can a trustee surrender to the creator of the trust or any one else the trust fund, or divert it to any other purpose than that declared by the instrument creating the trust, without being liable for the loss? The answer is that he can not.

In *Womack* v. *Austin,* 1 S. C., pg. 438, this Court says:

"When left to his own judgment the trustee must exercise his discretion in the manner in which a prudent man would in the management of his own affairs. Where, however, the course which he is to pursue is dictated and directed by the authority which originates the trust, he is provided with a chart, from which he is not allowed to depart, unless forced by a necessity which he can not resist." Further citation of authority is not necessary. Indeed, this principle is not denied. The application to this case is denied. It is stated and held that the necessity did exist and is contained in the order of the directors of the Seminole Securities Company.

It is said that by the statutes of this State the directors and not the stockholders have the right to make contracts for the corporation and to manage its affairs. If that be true, it cannot affect this case.

The contract by which the trustees were appointed is not in question. The question here is the right to break and not the right to make a contract. No authority has been suggested and I know of none to sustain the right to break a contract. It is urged that one hundred thousand dollars was too small a capital on which to do a successful insurance

business. That may be. If the trustees had organized the accident company, as their chart required, and had lost it all through no fault of their own, they could not have been held responsible for the loss. When the trustees depart from the chart, and loss occurs, they are liable for the loss, without reference to negligence, mismanagement or want of skill. It is urged that under the circumstances of this case the organization of the accident company was impossible. That may also be true, but that did not authorize the trustees to surrender the fund they had agreed to hold for ten years. It is further said that the Southern Life Insurance Company had the right to do an accident business. That is true. Its main business was life insurance. The main feature of the Sterling Accident Insurance Company was to have been accident insurance and any other business was to have been subsidiary.

Again, it is said that the Seminole Securities was the *cestui que trust* and the *cestui que trust* consented. The chart does not say so. It says: "In order to insure and safeguard the *subscribers* to the capital stock of the said Securities Company."

It was the platform upon which the campaign for subscriptions of stock was to be conducted. It was a pledge that at least one-third of the corporate funds would be safe from corporate mismanagement and fraud of corporate officials. Corporations are held to their contracts and can not rescind them at will. The trustees did not follow their chart, and I think are responsible for the loss occasioned thereby.

2. The loss from the purchase of the stock in the Southern Life Insurance Company was thirty thousand dollars and the appellants demanded judgment for that amount. The trustees were held not to be liable for the loss at all, so, of course, this judgment was refused.

The amount paid to the Southern Life Insurance Company was made up of two funds, to wit, the trust fund and

the corporate funds held in the Seminole Securities Company's treasury. The trustees claim that inasmuch as the receiver recovered more than one hundred thousand dollars, their loss is covered. The trustees did not pay the whole of the cash payment, and can not claim the whole recovery. I think the loss, therefore, should be divided between the two funds in the proportion to the amounts paid from each fund.

I think the judgment appealed from should be reversed.

MR. JUSTICE HYDRICK was disqualified, and MR. CHIEF JUSTICE GARY did not sit on the hearing of this case.